**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| TERRY CASH, *as Guardian Ad Litem for Shelly Pak Cash,* | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 1:12-CV-0876-RWS |
| | : | |
| BANK OF AMERICA, N.A., | : | |
| | : | |
| Defendant. | : | |

## <u>ORDER</u>

This case is before the Court for consideration of Defendant's Motion for

Summary Judgment [65].  After reviewing the record, the Court enters the

following Order.

## Background

Shelly Pak Cash ("Plaintiff") began her employment with Bank of

America, N.A. ("Defendant") in 1982 and for at least the last ten years of her

employment, worked as a drive-thru teller at the West Paces Ferry Banking

Center in Atlanta, Georgia ("banking center").[1]  As a drive-thru teller, Plaintiff

---

[1] Unless otherwise noted, the background material is taken from Defendant's
Statement of Undisputed Material Facts ("Def.'s SMF") ([65-2]) and is admitted by
Plaintiff.

was responsible for providing courteous and respectful customer service and processing customers' transactions accurately and efficiently in accordance with Defendant's established policies, procedures and guidelines.  Customer service was the most important aspect of Plaintiff's job.

Defendant required Plaintiff and all of its customer service employees to adhere to its G.U.E.S.T. policy regarding customer service standards.  To help monitor employees' compliance with G.U.E.S.T. standards, "mystery shoppers" from Defendant's consumer market team visit bank branches to evaluate the customer experience.  (Bettis Depo., [65-8] at 5 of 21.)  Branches are selected at random for mystery shops and branch employees are not informed in advance that a mystery shopper is coming.

Defendant's "Statement of Respect," its policy regarding employees' workplace conduct, reads: "Disruptive, unruly, or abusive behavior by associates in the workplace or at company sponsored events will not be tolerated.  Inappropriate conduct includes verbal or physical threats, fights, and obscene or intimidating language or behavior, as well as any other abusive conduct."  (Def.'s Ex. 6 to Pl.'s Depo., [65-5] at 17 of 47.)  Plaintiff was familiar with Defendant's customer service and associate conduct policies.

2

(Pl.'s Depo., [65-3] at 17-19 of 46.)  She also understood that she could be subject to disciplinary action, like any other employee, if she failed to adhere to Defendant's customer service and conduct policies, regardless of any conditions or disabilities from which she may have suffered.  (Id. at 19 of 46.)      The Employee Handbook contains Defendant's equal opportunity policy, which guarantees equal access and opportunity to those associates with legally protected disabilities and prohibits discrimination on the basis of disability. (Def.'s Ex. 6 to Pl.'s Depo., [65-5] at 19 of 47.)  Plaintiff testified that she received the Handbook every year, but she did not ever consult the Handbook to learn Defendant's policies pertaining to disabilities, accommodations, or leave.  (Pl.'s Depo., [65-3] at 26 of 46.)

Carol Capps was the banking center manager at the West Paces Ferry branch beginning in August or September 2008.  She later became a senior personal banker and vice-president at the Cumming Main branch.  (Capps Depo., [65-9] at 4 of 58.)  In December 2007, Jennifer Witherington Chapin[2] joined the West Paces Ferry branch as the assistant manager; she was promoted

---

[2] Ms. Jennifer Witherington Chapin is referred to in the record as Jennifer Witherington and Jennifer Chapin.  The Court will refer to her as "Jennifer Chapin" or "Chapin."

3

to banking center manager at the branch some time around September or

October of 2009.  (Chapin Depo., [65-6] at 4 of 50.)  Plaintiff reported to the

assistant manager and the banking center manager in the course of her daily

responsibilities.

During the relevant period of her employment with Defendant, Plaintiff

was diagnosed with obsessive compulsive disorder ("OCD") and generalized

anxiety disorder ("Anxiety Disorder").  Plaintiff was diagnosed with

posttraumatic stress disorder and bipolar disorder after her employment with

Defendant ended.  Plaintiff testified that her OCD and Anxiety Disorder caused

her to worry about "[c]leanliness and touching and closeness."  (Pl.'s Depo.,

[65-3] at 23 of 46.)  Plaintiff testified that she provided her supervisor with a

note from her doctor dated January 10, 2008, stating she was under medical

care for OCD and recommending that Plaintiff remain in her current work

environment in the drive-thru.  (Pl.'s SMF, [70] ¶ 28.)

Plaintiff worried constantly about cleanliness and engaged in a daily

cleaning ritual at work, which entailed cleaning her entire work station,

including the floor, wall, phone, computer, window, and doorknobs.  (Pl.'s

Depo., [65-3] at 23 of 46.)  When she did not have time to clean a new or

4

unfamiliar work station, she would put copy paper all over the station so she wouldn't have to touch anything.  (Id. at 22 of 46.)   She brought her own paper towels, wipes, Windex, and toilet tissue to work.  (Id. at 23 of 46.)  She never asked Defendant to provide her with extra cleaning supplies and she did not want to use Defendant's supplies because other employees were using them as well.  (Id.)

Between 2003 and 2008 Plaintiff received positive performance reviews from her supervisors, including in the area of customer service.  (Plaintiff's Statement of Material Facts ("Pl.'s SMF"), [70] ¶¶ 5-11.)  On April 27, 2007, however, Plaintiff received a Final Written Warning for inappropriate behavior after she "flipped off" a customer.  (Def.'s Ex. 7 to Pl.'s Depo., [65-5] at 21 of 47; Pl.'s Depo., [65-3] at 27 of 46.)  The warning indicated that if Plaintiff displayed inappropriate or rude conduct again, she could be subject to further disciplinary action, up to and including termination.  Then, in January 2008, Plaintiff received another Final Written Warning for "inappropriate language used when addressing another associate" and "inappropriately raising voice tone."  (Def.'s Ex. 8 to Pl.'s Depo., [65-5] at 22 of 47.)

5

Plaintiff testified as to her recollection of the January 2008 incident.  She claims that a part-time employee brought a big radio with him to work and began playing and singing along to rap music (including offensive swear words).  (Pl.'s Depo., [65-3] at 30 of 46.)  When Plaintiff asked him to stop and turn the music off, he refused and called her a "mother f**ker."  (Id.)  Plaintiff testified that she did not say anything inappropriate directly to the other employee, but she did go into a small break room and pound on the table and yell repeatedly at the walls and window, "mother f**ker, I can't believe you called me that; I can't believe you called me 'mother f**ker.'"  (Id.)  She also testified that she was sure the other employee heard her because the building was very small and her voice was raised.  (Id. at 30-31 of 46.)

Plaintiff testified that between March and October of 2009, "it was really hard for [her] at work" and it was "the very hardest period of being a teller," and by October, she "was getting much worse."  (Id. at 39 of 46.)  On May 28, 2009, Senior Teller Lily Lubarsky filed a written complaint against Plaintiff.  (Def.'s Ex. 11 to Pl.'s Depo., [65-5] at 25 of 47.)  The complaint alleges that Lubarsky went to cover Plaintiff's station while Plaintiff went to a doctor's appointment.  (Id.)  When Plaintiff returned from the doctor's appointment,

6

"she appeared very upset and rushed" and told Lubarsky that she would have to leave again for another doctor's appointment.  (Id.)  Then Plaintiff became very agitated and started yelling at Lubarsky with escalating loudness.  (Id.)  The yelling lasted for a "terrifying 15 minutes" and ended with Plaintiff yelling, "shut up" and "get out of here and don't come back."  (Id.)  The complaint says that Lubarsky felt "severely shaken" and "unsafe" and "afraid for [her] safety." (Id.)  Plaintiff testified that she did not recall details about the incident with Lubarsky.  (Pl.'s Depo., [65-3] at 32 of 46.)  Capps spoke with Plaintiff about Lubarsky's allegations and presented Plaintiff with a written warning on June 18, 2009.  (Pl.'s SMF, [70] ¶¶ 35-36.)

On June 17, 2009, Plaintiff submitted a letter to Capps from Dr. Howard Gould stating that Plaintiff suffered from OCD and recommending the following accommodations: "1) a segregated workplace similar to the drive through where she already works; 2) an adjustable teller stool with a vinyl plastic cover that can be easily wiped off and cleaned; [and] 3) the ability to attend medical appointments as scheduled and required."  (Def.'s Ex. 13 to Pl.'s Depo., [65-5] at 27 of 47.)  Capps gave a copy of the letter to Defendant's Advise & Counsel ("A&C").  Plaintiff was already working in the drive-thru

7

and Defendant allowed her to continue working there exclusively for the remainder of her employment with Defendant.  Defendant allowed Plaintiff to attend medical appointments as scheduled and required.  Plaintiff claims that it was sometimes difficult to find someone to cover for her in the drive-thru when she needed to leave for medical appointments, but cannot identify any specific incident when this occurred.

According to Plaintiff, Carol Capps said she ordered a vinyl chair for Plaintiff, but because Capps was transferring to another branch, Plaintiff should speak to Jennifer Chapin to make sure Plaintiff received it.  (Pl.'s Depo., [65-3] at 37 of 46.)  Plaintiff testified that when she followed up with Chapin about the chair, Chapin asked her to fill out another ADA form stating why Plaintiff needed the chair because the original form was lost.  (Id. at 37-38 of 46.)  There were no further discussions about the chair after that.  (Id.)  Plaintiff testified that she "couldn't sit" anyway if she was "handl[ing] the tubes or talk[ing] to the customer."  (Id. at 38 of 46.)  She explained that she would have to stand if she wanted to perform her job "efficiently, fast, and talk to the customer."  (Id.)

While Carole Capps was still the banking center manager, Plaintiff asked Capps if she could post a "will return" sign in the drive-thru window while she

8

was in the restroom.  Plaintiff testified that it took her longer to use the

restroom because of her cleanliness rituals.  (Id. at 38-39 of 46.)  However,

Capps was never made aware that Plaintiff needed longer or more frequent

restroom breaks because of any abnormal condition or disability.  When asked

if she was ever in trouble or disciplined for using the restroom and not being

available to customers, Plaintiff said she thought it had happened "several,

several years ago," but could not recall any details about who disciplined her.

(Id. at 39 of 46.)  Capps explained to Plaintiff that she could not use the sign

because it was not authorized by the bank, but instructed Plaintiff to use the

restroom as needed.

In October 2009, Plaintiff's doctor told Plaintiff about the Family and

Medical Leave Act ("FMLA"), and they discussed Plaintiff working reduced

hours.  (Id.)  Subsequently, Plaintiff requested intermittent FMLA leave.  The

leave was approved and processed through Defendant's FMLA leave

administrator, Aetna.  Specifically, on October 21, 2009, Plaintiff was

retroactively approved for intermittent FMLA leave for the period of October

15, 2009 through April 14, 2010, on the basis of two periods of incapacitation

from daily activities per month, and a probable duration of each episode of

incapacity of three days.  Plaintiff used her leave in the afternoons to allow her to work part-time.

On November 17, 2009, Plaintiff provided documentation from Dr. Margaret Shugart recommending that Plaintiff be allowed to work half days for the next two months, until January 18, 2010.  Dr. Shugart cited Plaintiff's "obsessive compulsive disorder [and] generalized anxiety disorder" as the reasons for her recommendations.  Aetna modified Plaintiff's intermittent FMLA leave to allow Plaintiff to work half days until January 18.  By letter dated December 17, 2009, Dr. Shugart recommended that Plaintiff be allowed to continue to work half days until February 22, 2010, which Defendant honored.  Plaintiff's request to work half days until February 22, 2010 was the last request Plaintiff made to Defendant for a medical accommodation.

On or before January 14, 2010, Plaintiff asked if she could work half days on a permanent basis.  Plaintiff did not submit documentation from a physician indicating that Plaintiff needed a permanent part-time position as a medical accommodation.  Defendant could not accommodate a part-time permanent position in the drive-thru at that time.  (Pl.'s Depo., [65-3] at 40 of 46.)  Plaintiff testified that Capps told her Jeremy Bray had been hired to work

10

part-time in the drive-thru, but Bray never did work in the drive-thru.  (Id. at 39 of 46.)

In early April 2010, Elizabeth Cornell applied for a position in the main branch, but declined the position during her interview with Chapin when she learned that it was a part-time position.  Defendant offered Plaintiff the permanent part-time position in the main branch, but Plaintiff declined.  Instead, she chose to stay in the drive-thru, and with approval from her doctor, resumed a full-time schedule on February 22, 2010.  Chapin contacted other branches in the area about open permanent part-time drive-thru positions, to no avail.

On April 8, 2010, Rhonda Bettis, a mystery shopper, visited the drive-thru at the West Paces Ferry branch.  Chapin knew Bettis from previously working together on Defendant's marketing team, but Chapin did not know that Bettis was coming to the branch that day.  (Pl.'s SMF, [70] ¶ 12.)  Bettis did not know Plaintiff before her visit to the branch, and did not recall ever having a conversation with Chapin or anyone else at the branch about Plaintiff or Plaintiff's disabilities.  (Bettis Depo., [65-8] at 6 of 21.)

Bettis testified that she had a "poor experience" at the drive-thru and that there was an unwillingness by Plaintiff to help or support her.  (Id.)

11

Specifically, Bettis reported that Plaintiff was not wearing her name tag, failed to give Bettis a friendly greeting, failed to assist Bettis in filling out a deposit slip, and did not have all lanes of the drive-thru open.  (Id.)  Bettis testified that when she attempted to give feedback to Plaintiff, Plaintiff was unreceptive and "seemed defiant."  (Id. at 16, 20 of 21.)  Plaintiff testified that Bettis yelled at her about the mystery shop experience.  (Pl.'s Depo., [65-3] at 44-45 of 46.)

Bettis immediately called Chapin to inform her about the mystery shopping experience.  Following the incident, Chapin had a call with Defendant's market team to discuss Bettis's observations.  (Bettis Depo., '65-8] at 6 of 21.)  Chapin testified that the day after the incident, she and Mandell Scott, the teller manager, sat down with Plaintiff to discuss the mystery shop. (Chapin Depo., [65-6] at 25 of 50.)  She testified that Plaintiff's account of what happened matched Bettis's account.  (Id.)  Plaintiff denies that Chapin spoke with her about the incident prior to the day Plaintiff was terminated.  (Pl.'s Depo., [65-3] at 46 of 46.)

Approximately a week after the mystery shopper incident, on April 15, 2010, a customer complained that Plaintiff was rude to her.  The customer went to the main branch and reported her complaint to Scott; he contacted Chapin

12

and relayed to her what had happened.  (Scott Depo., [65-11] at 20 of 43.)

Chapin called A&C to determine what to do about Plaintiff and the latest

complaint.  According to Chapin, she did not make independent decisions

regarding disciplinary actions; those decisions were made by A&C.  (Chapin

Depo., [65-6] at 9 of 50.)

Chapin and Scott then met with Plaintiff and informed her that the second

customer complaint in a one-week period was the last straw, and that she was

being terminated for her rude and inappropriate behavior.  Plaintiff testified that

she "knew [her] employment was over" on April 15, 2010, but, due to

Plaintiff's long career with Defendant, Chapin gave her two days to decide

whether her separation would be coded as a termination or a retirement.  (Pl.'s

Depo., [65-4] at 3-4 of 49; see also Ex.13 to Chapin Depo., [65-7] at 37 of 54.)

On the afternoon of April 15, 2010, Plaintiff turned in her keys and cash box

and was escorted from the banking center with her personal items.

On April 16, the day after she was informed her employment was over,

Plaintiff applied for FMLA leave.  Aetna records reflect that Plaintiff's FMLA

request was initially granted.  (Ex. to Pl.'s Resp., [71-1] at 9 of 32.)  The record

indicates that Chapin was contacted regarding Plaintiff's leave request and she

13

"verified [Plaintiff] had not been terminated prior to going on leave."  (Id.)

Then, on April 20, Chapin called Aetna and reported that Plaintiff was

terminated on April 15 due to inappropriate behavior at work.  (Id. at 23 of 32.)

Aetna requested written confirmation from Chapin regarding Plaintiff's

termination date, so Chapin emailed the Aetna claims associate, stating: "Shelly

Cash was advised of her termination on April 15, 2010. . . . The leave request

needs to be denied.  She was aware of the termination on April 15, 2010."  (Id.

at 26 of 32.)

The next day, however, a Client Liaison at Aetna emailed her colleagues:

"I checked eWorkplace and there is no inclination of termination for this

associate at this time.  I agree to process as normal unless we have official

notice."  (Id. at 27 of 32.)  Similarly, a Claim Leader from Aetna wrote to the

claim associate: "We are not able to deny a claim solely based on manager's

request.  Please confirm whether associate is in fact terminated/resigned from

employment as this would be the only basis in [sic] which to assess eligibility.

In the meantime, the claim is to continue accordingly [sic] to plan provisions."

(Id. at 28 of 32.)  Chapin told Aetna that she would provide proof that Plaintiff

14

was advised of her termination on April 15, and Aetna put off making a

determination on Plaintiff's claim.  (Id. at 29 of 32.)

Aetna records from April 29 reference a conversation between Chapin

and Aetna's Client Liaison.  (Id. at 30 of 32.)  The liaison's notes from the

conversation say:

> "[Chapin] confirmed that [Plaintiff] terminated on day
> before the leave began but because the [Plaintiff] had
> worked for [Defendant] so long, they gave [Plaintiff]
> the option of resigning and the [Plaintiff] had 2 days
> to resign.  The [Plaintiff] requested leave the day after
> term.  Now [Chapin] unable to process term because
> the notice period is in eW[orkplace].  The [Plaintiff]
> did not resign so the [Defendant] will terminate
> accordingly.  This was discussed with [Advise and
> Counsel] with their direction."

(Id.)  The April 29 record also includes an email dated April 15 from

Defendant's personnel advisory services to Chapin with the subject "Shelly

Cash - Letter of resignation template."  The body of the email says: "Jennifer, I

forgot to mention to have this document ready in case she wants to resign &

have her sign it."  On or before May 11, Plaintiff's FMLA claim was denied

and closed by Aetna, noting that Plaintiff was terminated on April 15.  (Id. at 25

of 32.)

15

AO 72A
(Rev.8/82)

Plaintiff is admittedly unaware of another associate who was the subject of at least two customer complaints within a one-week period, and she cannot identify another employee who was the subject of two complaints in a week who was also previously disciplined for unprofessional and inappropriate conduct toward customers and co-workers. Plaintiff testified she knew people who "had many write-ups" and were not fired. (Id. at 8 of 49.) When asked if she could identify those individuals, Plaintiff named Lilly Lubarsky and Jeremy Bray. (Id.) Plaintiff admitted, however, that Lubarsky was fired for her inappropriate behavior. (Id.) Plaintiff testified that Bray was not discharged for his inappropriate behavior, but she could not identify more than one specific incident where Bray acted inappropriately and she admitted that Bray quit before Defendant could fire him.

After Defendant terminated Plaintiff she applied for Social Security benefits. The Social Security Administration ("SSA") concluded that Plaintiff had been disabled, or unable to engage in any substantial gainful activity by reason of mental impairment, since April 16, 2010. The SSA paid Plaintiff retroactive benefits from April 16, 2010, and to this day, Plaintiff receives

16

Social Security benefits for her total inability to work.  Plaintiff confirmed that she has been unable to work since she was discharged from the bank.

On July 23, 2010, Plaintiff filed an EEOC Charge alleging she was discriminated against on the basis of her disability, specifically: "From June 1, 2009 to April 15, 2010, I asked for a reasonable accommodation and was denied.  On April 15, I was terminated.  The reason for my termination was a customer complaint."  Plaintiff checked the "disability" box on her EEOC Charge, but did not check the "retaliation" box.  Plaintiff then filed suit in this Court claiming: "Failure to Provide Reasonable Accommodations under ADA" (Count I); "Replaced by Someone Outside ADA Protected Class" (Count II); "Retaliation for Requesting Reasonable Accommodations" (Count III); and "Interference with the Exercise of FMLA Rights" (Count IV).  Defendant moves for summary judgment on all claims.

## Discussion

### I.  Legal Standard - Summary Judgment

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "The moving

party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257  (1986).

The applicable substantive law identifies which facts are material.  Id. at 248.  A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law.  Id.  An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249-50.

Finally, in resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party.  Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296

18

(11th Cir. 2002). But, the court is bound only to draw those inferences which are reasonable. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(a), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

## II.     Defendant's Motion for Summary Judgment

### A.     Procedurally Barred Claims

First, Defendant argues that several of Plaintiff's claims are procedurally barred due to the timing and content of her EEOC Charge. (Def.'s MSJ Br., [65-1] at 3-4.) To pursue ADA claims, a plaintiff must first file a charge of discrimination with the EEOC. 42 U.S.C. § 2000e-5(b); 42 U.S.C. § 12117(a) (importing powers, remedies, and procedures from Title VII into the ADA). In a non-deferral state like Georgia, the EEOC Charge must be filed within 180

19

days of the last complained-of action.  42 U.S.C. § 2000e-5(e)(1); 42 U.S.C. §

12117(a).  Plaintiff filed her Charge on July 23, 2010.  Thus, Defendant argues,

claims based on acts that occurred prior to January 23, 2010 are time-barred.

(Def.'s MSJ Br., [65-1] at 3.)

Further, a plaintiff may not allege in a judicial complaint new acts of

discrimination or new claims that were not included in the scope of the EEOC

charge.  Gregory v. Ga. Dept. of Human Res., 355 F.3d 1277, 1279-80 (11th

Cir. 2004). A "plaintiff's judicial complaint is limited by the scope of the EEOC

investigation which can reasonably be expected to grow out of the charge of

discrimination."  Id. at 1280 (quotation and citation omitted).  "The proper

inquiry" is whether Plaintiff's "complaint was like or related to, or grew out of,

the allegations contained in her EEOC charge."  Id.  Defendant argues that

because Plaintiff's Charge did not mention any retaliation claims and she did

not check the "retaliation" box on her Charge, she is precluded from bringing a

retaliation claim now.  (Def.'s MSJ Br., [65-1] at 3-4.)

Plaintiff responds that all of her claims are timely under the "continuing

violations doctrine."  (Pl.'s Resp. Br., [71] at 5-6.)  In Nat'l Railroad Passenger

Corp. v. Morgan, 536 U.S. 101 (2002), the Supreme Court considered whether,

and under what circumstances, a Title VII plaintiff may file suit on events that fall outside the statutory time period.  The Court found that "the statute precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period." <u>Id.</u> at 105.  Further, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.  Each discrete discriminatory act starts a new clock for filing charges alleging that act." <u>Id.</u> at 113.

The Court explained, "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify.  Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" <u>Id.</u> at 114.  By contrast, hostile environment claims "are different in kind from discrete acts.  Their very nature involves repeated conduct." <u>Id.</u> at 115.  "Such claims are based on the cumulative effect of individual acts." <u>Id.</u>  In those cases, "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." <u>Id.</u> at 105.

The Court finds that Plaintiff's claims fall under the rule for discrete acts. Plaintiff makes no attempt to show how her allegations establish a hostile work environment or a general culture of discrimination.  Instead, she alleges a limited number of discrete failures by Defendant to provide reasonable accommodations and she alleges that her termination was wrongful under the ADA.[3]  Therefore, the Court agrees with Defendant that only those acts that took place within 180 days of Plaintiff filing her EEOC Charge are actionable.

Plaintiff also contends that her retaliation claim is not barred because the intake questionnaire she completed when she filed her EEOC Charge included an attachment that alleges three incidents of "retaliation for taking FMLA." (Pl.'s Resp. Br., [71] at 3-5; EEOC Intake Questionnaire, [71-2] at 8 of 11.) The Court agrees with Plaintiff that the proper scope of a judicial complaint is not limited to the four corners of the EEOC Charge.  See King v. Georgia Power Co., 295 F. Supp. 943, 947 (N.D. Ga. 1968) (recognizing that many

---

[3] Specifically, Plaintiff alleges the following discriminatory acts by Defendant: denial of a permanent part-time drive-thru position; failure to replace outdated non-functioning security cameras at the drive-thru; failure to provide a vinyl chair for Plaintiff at her work station; failure to allow Plaintiff to post a "will return" sign when she used the restroom; failure to supply Plaintiff with additional cleaning supplies such as soap, antibacterial lotion, wipes, and paper towels; and wrongful termination based on her disability.  (Compl., [1] at 6-13 of 94.)

EEOC Charges are filed by "ordinary people unschooled in the technicalities of the law" and finding a judicial complaint "may properly encompass any such discrimination like or reasonably related to the allegations of the charge and growing out of such allegations during the pendency of the case before the [EEOC]").  The question then is whether Plaintiff's Complaint is like, related to, or grew out of, the allegations regarding retaliation in Plaintiff's intake questionnaire.

In her questionnaire, Plaintiff alleges the following retaliatory actions by Defendant: (1) she was targeted for a "secret shopper" within a few weeks of returning from FMLA leave, which was a "set up" by Chapin to pressure Plaintiff to resign or to build a case for Plaintiff's termination; (2) Chapin giving her two days to turn in her resignation or be terminated because of a customer complaint, which was just an excuse to terminate Plaintiff and bring in a replacement without disability issues; and (3) back dating her termination date to deprive Plaintiff of her already-approved disability leave.  (EEOC Intake Questionnaire, [71-2] at 8 of 11.)  In her Complaint, under her retaliation claim (Count III), Plaintiff lists the following allegations: (1) she was fired for asking for a permanent part-time position in the drive-thru; and (2) to avoid holding

her job open while she was on leave, Defendant back dated Plaintiff's

termination date.  (Compl., [1] at 14 of 94.)

The Court finds that the retaliation claim in Plaintiff's Complaint is

reasonably related to the retaliation allegations in her EEOC intake

questionnaire.  One would reasonably expect the retaliation claim to grow out

of a proper EEOC investigation, based on what Plaintiff submitted with her

Charge.  Consequently, Count III of the Complaint is not procedurally barred.

B.      Failure to Provide Reasonable Accommodations under the ADA
        (Count I)

In her Complaint, Plaintiff alleges the following failures by Defendant to

provide reasonable accommodations under the ADA: (1) refusal of Plaintiff's

request for a permanent part-time position in the drive-thru; (2) failure to

provide Plaintiff with a doctor-recommended vinyl chair; (3) denial of

Plaintiff's request to post a "will return" sign in the window when she was on

restroom breaks; and (4) refusal of Plaintiff's requests for additional cleaning

supplies.[4]  (Compl., [1] at 7-10 of 94.) As discussed in Part II.A., *supra*, claims

_____

[4] The Complaint also references a position in the drive-thru and installation of a
new security camera as requested accommodations.  However, the Complaint and the
record show that these accommodations were in fact provided by Defendant.  (See
Compl., [1] at 6, 9 of 94.)  Thus, the Court will not consider them under Plaintiff's

based on alleged discriminatory acts that occurred before January 23, 2010 are time-barred.

Plaintiff admits that she requested a permanent part-time position in the drive-thru on or before January 14, 2010, but her request was denied because Defendant could not accommodate such a position at that time.  (Pl.'s Resp. to Def.'s SMF, [69] ¶ 55; Pl.'s Depo., [65-3] at 40 of 46.)  Thus, that claim is time-barred.[5]  Plaintiff's doctor recommended a vinyl stool for Plaintiff in a letter dated June 17, 2009.  After Chapin became the banking center manager in October or November of 2009, Plaintiff filled out a second ADA form

─────────────────

"failure to provide accommodations" claim.

[5] To the extent Plaintiff's Complaint suggests she made this particular request repeatedly until her termination, Plaintiff has not produced any evidence that the request was medically supported or reasonable.  Plaintiff admits that her physician released her to work full time beginning on February 22, 2010.  She also admits that Defendant offered her a permanent part-time position that was available in the main branch.  Plaintiff has presented no evidence that a permanent part-time drive-thru position existed during the time she was employed by Defendant and the case law in this Circuit makes clear that Defendant was under no obligation to create a new part-time position to accommodate Plaintiff.  See Terrell v. USAir, 132 F.3d 621, 626 (11th Cir. 1998) ("Although part-time work, as the [ADA] statute and regulations recognize, may be a reasonable accommodation in some circumstances (particularly where the employer has part-time jobs readily available), we hold that USAir was not required to *create* a part-time position for Plaintiff where all part-time positions had already been eliminated from the company."); Diaz v. Transatlantic Bank, 367 Fed. App'x 93, 96 (11th Cir. 2010) ("An employer is not required to reasonably accommodate an employee by creating a new position.") (citing Terrell, 132 F.3d at 626-27).

requesting the stool.  Plaintiff said she did not follow up with Chapin about the

stool after that, and the stool did not appear in later physician-certified requests

for accommodations.  Accordingly, that claim is also time barred.  Finally,

Plaintiff's request to post a "will return" sign was denied some time before

August 2009, while Capps was still the banking manager, so that claim is

untimely.[6]

The remaining claim is Defendant's failure to provide Plaintiff with

additional cleaning supplies.  Defendant argues this claim fails because Plaintiff

is not a "qualified individual" under the ADA and because the accommodation

is not reasonable.  (Def.'s MSJ Br., [65-1] at 7-17 of 30.)  Under the ADA,

"[a]n employer unlawfully discriminates against a qualified individual with a

disability when the employer fails to provide 'reasonable accommodations' for

the disability – unless doing so would impose undue hardship on the employer."

Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1255 (11th Cir. 2001) (citing 42

U.S.C. § 12112(b)(5)(A)).  "An accommodation can qualify as 'reasonable,'

and thus be required by the ADA, only if it enables the employee to perform the

---

[6] Plaintiff does not dispute Defendant's characterization of the timing of any of
these events in her response brief.  (Def.'s MSJ Br., [65-1] at 7 of 30.)

essential functions of the job.  The plaintiff bears the burden of identifying an accommodation, and of demonstrating that the accommodation allows him to perform the job's essential functions."  Id. (internal citations omitted).

Assuming, without deciding, that Plaintiff is a "qualified individual" under the ADA, the Court agrees with Defendant that Plaintiff has not shown the provision of cleaning supplies was a reasonable accommodation.[7] According to the interpretive guidance on the ADA, "it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed."  29 C.F.R. Pt. 1630, App'x. § 1630.9 (2011).  Capps, Chapin, and Plaintiff herself testified that Plaintiff never asked Defendant to provide her with additional cleaning supplies on a regular basis, nor did she submit documentation from a physician recommending such an accommodation. (Def.'s SMF, [65-2] ¶ 19.)  Instead, she testified, she would request cleaning supplies from the main branch whenever she ran out of supplies at the drive-thru.  (Pl.'s Depo., [65-3] at 25 of 46.)  And when she found out that she could have asked the bank to pay for additional supplies for her, she said, "I just

_____

[7] Plaintiff does not even mention this particular accommodation in her response brief or in her statement of material facts.

27

rather bring my own supplies just in case they didn't have it." (Id. at 23 of 46.)

Capps and Chapin testified they were unaware that Plaintiff was bringing her

own cleaning products to work. (Def.'s SMF, [65-2] ¶ 20.)

Plaintiff has presented no evidence that Defendant knew she needed

additional cleaning supplies on a regular basis in order to perform the essential

functions of her job. Furthermore, even if Plaintiff had notified Defendant of

her need for this accommodation, she has not made any effort to show how

additional cleaning supplies would have enabled her to perform the essential job

function in question – customer service. Therefore, Plaintiff's claim for failure

to provide reasonable accommodations under the ADA is **DISMISSED.**

C.    Wrongful Termination Based on Disability in Violation of the
      ADA (Count II)

Plaintiff claims Chapin terminated her in order to replace Plaintiff with a

non-ADA worker. (Compl., [1] at 12-13 of 94.) She alleges Chapin

intimidated her into returning to full-time hours on February 22, 2010, and

Chapin "set up" a performance-based termination. (Id.) Defendant argues

Plaintiff's claim fails as a matter of law because (1) Plaintiff cannot make out a

*prima facie* case for disability discrimination because she cannot identify a

similarly situated, non-disabled employee who was treated more favorably; (2)

28

Defendant had a legitimate, non-discriminatory reason for terminating Plaintiff; and (3) Plaintiff cannot demonstrate pretext.  (Def.'s MSJ Br., [65-1] at 18-23 of 30.)  The Court agrees with Defendant.

"To establish a circumstantial *prima facie* case of discrimination under the ADA, the plaintiff must demonstrate that [s]he (1) is disabled, (2) is a qualified individual, and (3) was subjected to unlawful discrimination because of [her] disability."  Shepard v. United Parcel Service, Inc., 470 Fed. App'x 726, 728 (11th Cir. 2012).  The Parties do not dispute that Plaintiff is disabled. Assuming again, without deciding, that Plaintiff is a qualified individual under the ADA, her claim turns on whether she was terminated because of her disability or for a legitimate, non-discriminatory reason.  "To establish unlawful disparate treatment, a plaintiff generally must demonstrate that [her] employer treated similarly situated employees outside of [her] protected class more favorably than [s]he was treated."  Wolfe v. Postmaster General, 488 Fed. App'x 465, 468 (11th Cir. 2012).  To determine whether employees are similarly situated, courts in this Circuit evaluate "whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.  In doing so, the quantity and quality of the comparator's

29

misconduct must be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." McCann v. Tillman, 526 F.3d 1370, 1373 (11th Cir. 2008).

Plaintiff maintains that she was treated worse than similarly situated employees in these respects: (1) she was left to handle the drive-thru on her own without any assistance; (2) Lilly Lubarsky, a teller without disabilities, was the subject of numerous complaints but was not treated as harshly as Plaintiff; and (3) Jeremy Bray, a non-disabled teller, was permitted a flexible schedule where he could work part-time. (Pl.'s Resp. Br., [71] at 13 of 21.) Plaintiff's first allegation has nothing to do with her termination, and is unrelated to any showing that her termination was *because of* her disability. Plaintiff's allegation regarding Jeremy Bray also has no bearing on Plaintiff's termination. Defendant does not dispute that Bray was allowed to work part-time. However, he did so in the main branch. Plaintiff was offered that same position and declined because she preferred to remain in the drive-thru.

Plaintiff alleges Lubarsky had many complaints lodged against her, but there is "no evidence . . . that Ms. Lubarsky was treated as harshly as Plaintiff." (Pl.'s Resp. Br., [71] at 13 of 21.) However, in her own testimony, Plaintiff

30

admits that Lubarsky was also terminated by Defendant.  (Pl.'s Depo., [65-4] at

8 of 49 (Q: Was Lilly ultimately fired for inappropriate behavior?  A: Yes.)[8]

Thus, even if Plaintiff and Lubarsky were similarly situated in terms of the

complaints lodged against them, they received the same treatment from

Defendant.  Plaintiff admits she cannot identify any other employee, disabled or

non-disabled, who had two Final Warnings issued to them for inappropriate and

unprofessional behavior, followed by two customer complaints in a single

week.  (Pl.'s Resp. to Def.'s SMF, [69] ¶ 91.)

Even if Plaintiff could make out a *prima facie* case for discrimination,

Defendant claims it had a legitimate, non-discriminatory reason for terminating

Plaintiff's employment – her rude and inappropriate behavior toward customers

and co-workers.  (Def.'s MSJ Br., [65-1] at 17.)  Plaintiff counters that there "is

reason to believe" Defendant's proffered reason for Plaintiff's termination is

pretext.  (Pl.'s Resp. Br., [71] at 14-15 of 21.)  The Court agrees with Defendant

---

[8] Plaintiff also references Jeremy Bray in her deposition as someone who received customer complaints and numerous "write-ups" but didn't get fired. However, she testified that Bray quit before Defendant had a chance to fire him.  (Pl.'s Depo., [65-4] at 8 of 49.)

that Plaintiff's assertion is insufficient to carry her burden at the summary

judgment phase.

When a plaintiff relies on circumstantial evidence to establish

discriminatory intent, as Plaintiff does in this case, courts apply a burden-

shifting framework to test the sufficiency of the claim.  Brooks v. Cnty

Comm'n of Jefferson County, Ala., 446 F.3d 1160, 1162 (11th Cir. 2006)

(citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).  Under the

McDonnell Douglas framework, if a plaintiff establishes a *prima facie* case, the

defendant has the burden of producing a legitimate, non-discriminatory reason

for its employment action.  Id.  Once the defendant has met its burden, "the

plaintiff much show that the proffered reason really is pretext for unlawful

discrimination."  Id. (quotations and citation omitted).  "Although the

intermediate burdens of production shift back and forth, the ultimate burden of

persuading the trier of fact that the employer intentionally discriminated against

the employee remains at all times with the plaintiff."  Id. (quotations and

citation omitted).  To demonstrate pretext, Plaintiff must provide evidence that

reveals "such weaknesses, implausibilities, incoherencies or contradictions in

the employer's proffered legitimate reasons for its actions that a reasonable fact

32

finder could find them unworthy of credence."  Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 771 (11th Cir. 2005).

As evidence that Defendant's stated reason for terminating Plaintiff was pretext, Plaintiff points to the following facts: (1) Bettis, the mystery shopper, testified that the discipline she expected Plaintiff would receive from the failed mystery shopping experience was a coaching session, and Chapin did not bother to discuss the incident with Plaintiff until her termination meeting; and (2) Defendant did not investigate the incident with the customer on April 15, 2010, but instead, immediately called Aetna to see if Plaintiff was on FMLA leave and A&C to see if Plaintiff could be terminated.  (Id.)  Plaintiff's Complaint also mentions Chapin's interview with Elizabeth Cornell prior to Plaintiff's termination, which left Cornell with the impression that a full time position would be available soon (presumably, Plaintiff reads this to mean her position, but does not so specify in her Complaint), and a phone call from Cornell (who ultimately replaced Plaintiff in the drive-thru) expressing "shock and sorrow" about Plaintiff's termination.  (Compl., [1] at 12-13 of 94.)

As to Plaintiff's first argument, the Court does not see how Bettis's thoughts on how Plaintiff might be disciplined are relevant.  She was not in a

33

position to make those types of personnel decisions and there is no evidence that she knew about the prior warnings issued to Plaintiff for her rude and inappropriate behavior.  She did, however, immediately confront Plaintiff about the failed mystery shop and contact Chapin about the incident, which indicates that her concerns about Plaintiff's performance were not trivial.

Regarding Plaintiff's argument that Defendant failed to properly investigate the customer complaints against her, Defendant cites ample authority that this argument is insufficient to establish pretext.  (Def.'s Reply Br., [72] at 11 of 18, n. 15.)  "It is a well-settled principle of employment law that in investigating employee misconduct and reaching an employment decision, employers are entitled to make credibility decisions, and [the Court's] inquiry is limited to whether the employer reasonably believed in good faith that the employee had engaged in misconduct, not whether the employee actually did so."  Leach v. State Farm Mut. Auto. Ins. Co., 431 Fed. App'x 771, 777 (11th Cir. 2011).  See also Damon v. Fleming Supermarkets of Fl., Inc., 196 F.3d 1354, 1361 (11th Cir. 1999) (We have repeatedly and emphatically held that a defendant may terminate an employee for a good or bad reason without violating federal law.  We are not in the business of adjudging whether

34

employment decisions are prudent or fair.  Instead, our sole concern is whether

unlawful discriminatory animus motivates a challenged employment

decision."); EEOC v. Total Sys. Serv.s, Inc., 221 F.3d 1171, 1176 (11th Cir.

2000) (business decisions such as firing an employee for misconduct are "not

for the courts to second-guess as a kind of super-personnel department," and an

employer needs only an honest, good-faith belief that the employee has engaged

in misconduct) (citing Sempier v. Johnson & Higgins, 45 F.3d 724, 731 (3d Cir.

1995) ("Pretext is not demonstrated by showing simply that the employer was

mistaken.")).

 Finally, regarding Plaintiff's contention that Ms. Cornell's interview

somehow supports a finding of pretext, the Court finds this argument is also

without merit.  Plaintiff has not pointed to any evidence in the record to support

this allegation.  Further, Ms. Cornell's general impression that *some* full-time

position may open up is insufficient to show that Ms. Chapin was plotting

Plaintiff's termination because of Plaintiff's disability.

 In sum, the Court concludes that even if Plaintiff could establish a *prima*

*facie* case of unlawful termination, she has not shown that Defendant's

legitimate reason for terminating her – multiple complaints about inappropriate

and rude conduct – is pretext for discrimination.  Therefore, Plaintiff's claim for unlawful termination based on her disability is **DISMISSED.**

### D.      Retaliation (Count III)

Plaintiff claims Defendant retaliated against her for requesting reasonable accommodations under the ADA.  (Compl., [1] at 14 of 94.)  Specifically, she contends Defendant retaliated against her for requesting a permanent part-time position in the drive-thru in mid-March 2010, and for requesting and receiving FMLA leave on April 16, 2010.  (Id.)  To establish a *prima facie* retaliation claim, Plaintiff must show: (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) the protected activity was causally connected to the adverse employment action.  Garrett v. Univ. of Ala. at Birmingham Bd. of Tr.s, 507 F.3d 1306, 1315-16 (11th Cir. 2007). Defendant argues Plaintiff cannot show causation because temporal proximity alone cannot demonstrate retaliatory motive where her own inappropriate behavior "broke the causal chain."  (Def.'s MSJ Br., [65-1] at 24-25 of 30.) Plaintiff's only response is that she "need not prove actual causation" and "the timing [of Plaintiff's termination] is suspicious."  (Pl.'s Resp. Br., [71] at 16-17 of 21.)  Again, the Court agrees with Defendant.

36

"The causal connection element is satisfied if a plaintiff shows the protected activity and adverse action were not wholly unrelated." Krutzig v. Pulte Home Corp., 602 F.3d 1231, 1236 (11th Cir. 2010). "Causation may be shown, among other ways, by demonstrating that there is a 'close temporal proximity' between the employer's awareness of the protected activity and the adverse employment action." Hankins v. AirTran Airways, Inc., 237 Fed. App'x 513, 520 (11th Cir. 2007) (citing Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1337 (11th Cir. 1999)). However, causation need not be inferred from temporal proximity alone where an employee's misconduct severs the causal connection. Id. at 520-21.

Here, Plaintiff alleges that her termination was retaliation for her request for a permanent part-time position in the drive-thru in mid-March.[9] However, the record shows two intervening customer complaints against Plaintiff (which, the Court notes, occurred in much closer proximity to Plaintiff's termination). The customer complaints, coupled with Plaintiff's prior final warnings

---

[9] Plaintiff's claim that she requested a permanent part-time accommodation in mid-March is not supported by the record, which indicates she made that request on or before January 14, 2010. However, the discrepancy does not impact this portion of the Court's analysis.

37

regarding inappropriate workplace behavior, show that Defendant had a

legitimate, non-discriminatory reason to terminate Plaintiff when it did.

Furthermore, when Plaintiff requested a permanent part-time position,

Defendant offered her one, just not in the location Plaintiff wanted.

Plaintiff also alleges that her termination date was back dated because she

"asked for and was granted leave to accommodate for illness on April 16,

2010." (Compl., [1] at 14 of 94.)  However, Plaintiff testified that she knew on

April 15 that her employment with Defendant was over and she would not be

returning to the bank.  (Pl.'s Depo., [65-4] at 3-4 of 49.)  Plaintiff turned in her

keys and cash box and was escorted from the banking center with her personal

belongings on April 15.  (Id.)  Therefore, the notion that Plaintiff's termination

was back dated in retaliation for her leave request on April 16 is implausible.

She knew, as did Defendant, that she would not be returning to work after April

15; the termination decision had already been made.  Accordingly, Plaintiff's

retaliation claim is **DISMISSED.**

E.    Interference with Exercise of FMLA Rights (Count IV)

Under the FMLA, employers are prohibited from interfering with an

employee's attempt to exercise her leave rights.  29 U.S.C. § 2615.  To establish

38

an interference claim, "an employee must demonstrate that [s]he was denied a benefit to which [s]he was entitled under the FMLA." Martin v. Brevard Cnty. Pub. Sch., 543 F.3d 1261, 1266-67 (11th Cir. 2008). According to the Eleventh Circuit, the right to take leave "obviously cannot be exercised after the termination of an employment relationship." Smith v. BellSouth Telecomm., Inc., 273 F.3d 1303, 1311 (11th Cir. 2001).

Defendant argues that Plaintiff was not entitled to FMLA leave, and thus cannot maintain an interference claim, because she was not Defendant's employee when she requested leave on April 16. (Def.'s MSJ Br., [65-1] at 26 of 30.) Plaintiff contends that because Defendant gave her two days to decide whether her separation would be coded as a "resignation" or a "termination," she was not in fact terminated on April 15. (Pl.'s Resp. Br., [71] at 18 of 21.) Further, she argues, Aetna initially concluded that Plaintiff was Defendant's employee on April 16 and awarded benefits, and "[i]t was only after repeated telephone calls and lobbying from the Defendant that Aetna reversed its initial decision to provide Plaintiff FMLA leave." (Id.) The Court finds Plaintiff's arguments disingenuous.

39

In her deposition, Plaintiff made clear that she knew her employment with Defendant was over on April 15.  (Pl.'s Depo., [65-4] at 3-4 of 49 ("Q: On April 15, 2010, you were escorted out with your personal items, correct?  A: Yes.  Q: And you knew that you were not returning to work at the bank?  A: Yes.  Q: You knew your employment was over?  A: Yes.")  Plaintiff also testified that she knew when she applied for leave on April 16 that she would not be returning to work.  (Id. at 6 of 49 ("Q: You knew when you requested leave on April 16, though, that you were not returning to work regardless?  A: Yes.")  As for the alleged "lobbying" by Defendant to have Plaintiff's FMLA benefits denied, it appears from the record that Chapin was simply providing the official notice of Plaintiff's termination that was requested by Aetna in order to make a determination on Plaintiff's FMLA claim.  (See generally Ex. to Pl.'s Resp., [71-1].)

Plaintiff is attempting to capitalize on a courtesy extended by Defendant (i.e., allowing her to resign from her long-held position rather than being fired) by putting form over substance.  The record shows that she was separated from Defendant on April 15, a reality which Plaintiff understood when she proceeded to seek FMLA leave the following day.  The fact that her termination was not

40

coded in Defendant's computer system until later does not alter that reality.

Plaintiff's FMLA interference claim is **DISMISSED**.


### Conclusion

In sum, Plaintiff has not presented affirmative evidence to show that a genuine issue of material fact exists with respect to any of her claims. Accordingly, Defendant's Motion for Summary Judgment [65] is **GRANTED.**

**SO ORDERED**, this  25th  day of October, 2013.


_____
RICHARD W. STORY
UNITED STATES DISTRICT JUDGE


41

AO 72A
(Rev.8/82)